FILED

2008 Mar-31  AM 09:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 06-B-0667-S |
| | ) | |
| SOUTHEASTERN ENVIRON-MENTAL INFRASTRUCTURE LLC; LARRY RIVERS; DOSTER CONSTRUCTION CO., INC.; INTEGRAL DOSTER METRO GARDENS CONSTRUCTION - A JOINT VENTURE; INTEGRAL BUILDING GROUP L.L.C.; METROPOLITAN GARDENS DEVELOPERS L.L.C., | ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| SOUTHEASTERN ENVIRON-MENTAL INFRASTRUCTURE L.L.C., | ) ) | |
| | ) | |
| COUNTER CLAIMANT, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| COUNTER DEFENDANT, | ) | |
| _____ | ) | |

METROPOLITAN GARDENS )
DEVELOPERS L.L.C.; DOSTER )
CONSTRUCTION CO., INC.; )
INTEGRAL DOSTER METRO )
GARDENS CONSTRUCTION - A )
JOINT VENTURE; INTEGRAL )
BUILDING GROUP L.L.C., )
 )
      COUNTER CLAIMANTS, )
 )
v. )
 )
PENNSYLVANIA NATIONAL )
MUTUAL CASUALTY INSURANCE )
COMPANY, )
 )
      COUNTER DEFENDANT. )

## MEMORANDUM OPINION

This case is presently pending before the court on Motions for Summary Judgment filed by each party.  (Docs. 110, 112, 115, 118.)[1]  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that plaintiff's Motion for Summary Judgment, (doc. 118), is due to be granted in part and denied in part; defendants' Motions for Summary Judgment, (docs. 110, 112, 115), are due to granted in part and denied in part.

---

[1]Reference to a document number, ["Doc. ____"], refers to the number assigned to each document as it is filed in the court's record.

2

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. STATEMENT OF FACTS[2]

Doster Construction Company, Inc., and Integral Building Group, L.L.C., formed Metropolitan Gardens Developers, L.L.C.  (Doc. 31 ¶ 5.)  Doster, Integral, and "the Integral/Doster Metro Gardens Construction, a Joint Venture,"[3] entered into a subcontract with Southeastern Environmental Infrastructure, L.L.C., ["SEI"], for SEI to install "Site Utilities, Sanity Sewer, Domestic & Fire Water Lines" on the Metropolitan Gardens Hope VI -Phase I project.  (Doc. 120, Ex. 2 at 0082.)  Edmond Watters was the President and sole shareholder of SEI, which is currently "dormant."  (*Id*., Ex. 1 at 8-10.)

The subcontract required SEI to maintain $1,000,000 in comprehensive general liability that named the "Contractor" – Integral/Doster Metro Gardens Construction – and the "Owner[s]" – Doster and Integral – as additional insureds.  (*Id*., Ex. 2 at 0087, 0131.)  Also, the subcontract required SEI –

> to defend, indemnify and save harmless Contractor and Owner, from and against any claim, cost, expense, or liability caused by, arising out of, resulting from, or occurring in connection with the performance of the Work by Sub-contractor, its privies, or their respective agents, servants, or employees, but

---

[2]For purposes of summary judgment, all facts and reasonable inferences therefrom are drawn in favor of the non-movant.

[3]Doster, Integral, and Metropolitan Gardens Developers contend that Integral/Doster Metro Gardens Construction is not a legal entity.  (*See* doc. 19 ¶ 5; doc. 31 ¶ 5.)  However, because Integral/Doster Metro Gardens Construction is the named "Contractor" in the SEI subcontract and because no party has moved to dismiss Integral/Doster Metro Gardens Construction, the court, for purposes of deciding the Motions for Summary Judgment, will consider Integral/Doster Metro Gardens Construction a proper defendant.  The court will refer to defendants Doster, Integral, Metropolitan Gardens Developers, and Integral/Doster Metro Gardens Construction, collectively as "the Joint Venture."

only to the extent the claim, cost, expense, or liability is a result of the negligence of this Subcontractor, [its] privies, or their respective agents, servants or employees.

(*Id.* at 0088.)

Johnny Prewitt of J.R. Prewitt and Associates acted as SEI's insurance agent and procured a commercial general liability ["CGL"] policy, policy number CL9 0603924, from plaintiff Pennsylvania National Insurance Company ["Penn National"]. (*See id.*, Ex. 1 at 43; *id.*, Ex. 11 at 2.) Prewitt provided the Joint Venture with a Certificate of Insurance that stated "Integral-Doster Metro Gardens Construction Joint Venture is an Additional Insured in regards to General Liability."[4] (Doc. 119, Ex. L.)

The CGL policy contained an exclusion from coverage for the accidents or incidents involving employees while acting within the course of their employment. (Doc. 120, Ex. 11 at 14.) The policy stated:

This insurance does not apply to:

. . .

e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

_____

[4]The record does not contain a Certificate of Insurance or other evidence naming Doster, Integral, and/or Metropolitan Gardens Developers as additional insureds; however, no party disputes that these defendants are additional insureds.

5

> (b)  Performing duties related to the conduct of the insured's business; . . .
>
> . . .

This exclusion applies:

> (1)  Whether the insured may be liable as an employer or in any other capacity; and
>
> (2)  To any other obligation to share damages with or repay someone else who must pay damages because of the injury.
>
> This exclusion does not apply to liability assumed by the insured under an "insured contract".

(Doc. 120, Ex. 11 at 14.)  An "insured contract" was defined in the CGL policy as – "That part of any other contract or agreement pertaining to your business . . . under which *you assume the tort liability of another party* to pay for "bodily injury" . . . to a third person or organization."  (*Id*. at 25 [emphasis added].)  The CGL policy used the word "you" to "refer to the Named Insured shown in the Declarations."  (*Id*. at 13.)  SEI was the Named Insured. (*Id*. at 2.)

The CGL policy used the word "insured" to refer to anyone "qualifying" as an insured party under the terms of the policy.  (*Id*. at 13.)  The CGL policy contained an endorsement, which added the following:

> Any person(s) or organization(s) (referred to below as "additional insureds") with whom you are required in a written contract or agreement to name as an additional insured but only for "your" acts or omissions arising from "your" ongoing operations at the location or project described in the contract or agreement.

The insurance provided to the additional insured does not apply to "bodily injury" . . . :

>    a. Arising out of any act or omission of the additional insured(s) or any of their "employees", including supervision of "your work" or the work of any other person or organization.

>    . . .

These exclusions apply in addition to those contained in the Coverage Part [of the CGL policy].

(*Id.* at 12.)

Also, the CGL policy contained a notice requirement, which stated:

>    a. ***You*** must see to it that we are notified ***as soon as practicable*** of an "occurrence" or an offense which may result in a claim.   To the extent possible, notice should include:

>>    (1)  How, when and where the "occurrence" or offense took place;

>>    (2)   The names and addresses of any injured persons and witnesses; and

>>    (3) The nature and location of any injury or damages arising out of the "occurrence" or offense.

>    b.   If a claim is made or "suit" is brought against ***any insured***, ***you*** must:

>>    (1)  Immediately record the specifics  of the claim or "suit" and the date received; and

>>    (2)  Notify us as soon as practicable.

>    ***You*** must see to it that we receive written notice of the claim or "suit" as soon  as practicable.

    c. ***You and any other involved insured*** must:

        (1)  Immediately send us copies  of  any demands, notices, summonses or legal papers received in connection with the claim or "suit";

        (2)  Authorize us to obtain records and other information;

        (3)  Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

        (4)  Assist us, upon our request, in  the enforcement of any right against any person or organization which may  be liable to the insured because of injury or damage to  which  this  insurance may also apply.

    d. No ***insured*** will, except at that ***insured's*** own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

(*Id*. at 22-23 [emphasis added].)

After SEI had completed about seventy percent of its work on the Hope VI Project, SEI was notified that it needed a certified or licensed plumber to complete the sewer tie-ins. (*Id*., Ex. 1 at 28-30.)  Watters hired Larry Rivers, a journeyman plumber, in August or September 2004, to make the sewer tie-ins. (*Id*., Ex. 4 at 37, 52.)  At this time, Melvin Butler and Robert Dawson were the only employees of SEI.  (Doc. 113, Ex. E.)  According to Watters, SEI did not "employ" plumbers. (Doc. 120, Ex. 26 at 24.)  If he needed a plumber, he would contract with one.  (*Id*.)

When negotiating the terms of his working relationship with SEI, Rivers testified Watters had wanted to pay him for the whole job, but that Rivers told him that he could not afford to be paid by the job and wanted to be paid by the hour.  (*Id*., Ex. 4 at 63-64.)  Watters

agreed to pay Rivers $11 an hour.  (*Id*. at 64.)  Rivers testified that he could not get a raise because it was not part of his contract.  (*Id*. at 88-89.)  He turned in his hours to Butler and received a check from SEI every two weeks.  (*Id*.)  Rivers provided SEI with certain information necessary for it to prepare a Form 1099 for tax purposes.  (Doc. 113, Ex. F.)

Rivers worked with Dawson and Butler; Butler operated the trackhoe and Dawson acted as Rivers's helper. (Doc 120, Ex. 4 at 54-55.) Rivers testified that he was the boss and the work was done to his satisfaction.  (*Id*. at  100.)  He was responsible for the work as it was done under his plunber's license.  (*Id*.)  He testified that SEI had not provided him any guidelines or rules regarding the manner in which he was to perform his work.  (*Id*. at  62.) He testified, "I didn't work for SEI.  I worked for Larry Rivers through SEI.  SEI contracted me to tie in the sewer.  I didn't work ***for*** SEI[;] I worked ***with*** SEI."  (*Id*. at  95 [emphasis added].)

Rivers controlled when the pipes would be laid and connected.  (*Id*. at  101-02.)  He testified, "If I wasn't ready to [connect the pipes], it didn't get done."  (*Id*. at 101.)  Rivers decided "the way to make the tie-ins, where to cut the pipe, how to cut the pipe, [and] how to connect the pipe . . . ."  (*Id*. at 102-03.)  According to Rivers, no one from SEI controlled or had the right to control the manner in which he did his work.  (*Id*. at 112.)

Rivers worked approximately thirty hours per week on the Hope VI Project.  (*Id*. at  61.)  A typical day for the SEI crew was 7:00 a.m. to 3:30 p.m.  (*Id*. at 29.)  He did not work on any other plumbing jobs during that time.  (*Id*. at 61-62.)  He provided "[his] own hand

tools [and] [b]oots, hard hat, gloves, pencils, [his] tape, . . . pens and knife." (*Id*. at 74.)  SEI

provided the iron pipe, trackhoe, and  the sling used to place the pipe.  (*Id*. at 49-50.)  Also,

SEI had a trailer on-site, and Rivers was free to use tools from the trailer.  (*Id*. at 56-57.)

On the morning of Friday, October 8, 2004, Rivers told Watters that it was his last day

to work on the Hope VI project because he was "going back to [his] old job."  (*Id*. at  82-83.)

At the end of the day, Rivers was injured at the site when an iron pipe struck him in the head.

The Birmingham Fire and Police Departments arrived at the site and transported Rivers to

the hospital.  The Police Department's report of the accident stated:

> [Officer] responded to the scene of a person down at the listed location and
> found Birmingham Fire and Rescue treating the victim.  [The reporting party]
> and [the] witness stated that all three of them were laying 6" iron pipe in a 5'-6'
> ditch with the [victim] in the ditch guiding the pipe.  The [sling] holding the
> pipe suspended in the air either shifted or broke and consequently dropped the
> pipe.  The pipe struck the [victim] in the head and pinned him in the bottom
> of the ditch.  The [reporting party] and [the] witness then extricated the
> [victim] from the ditch before rescue personnel arrived on the scene.  The
> [victim] was then transported to [the] hospital by [the Birmingham Fire
> Department] with serious head injuries.

(Doc. 123, Ex. BB at 4.)  The Joint Venture also investigated the accident and made similar

findings, and it also found that Rivers had suffered "severe head trauma."  (*Id*., Ex. AA at

1.)

Watters testified that he "was told that [Rivers's injuries] could be serious."  (Doc.

120, Ex. 1 at 81.)  He went to the hospital the day of the accident, and he visited Rivers at

his home after he was released from the hospital 29 days after the accident. (Doc.  112, Ex.

A at 105; *id*., Ex. B at 87; doc. 131, Ex. H at PN LC 00606.)   He did not report the accident

to Penn National because he "honestly didn't know if a lawsuit would be filed or any claim would be made so [he] . . . didn't notify Mr. Prewitt until the presuit discovery came." (Doc. 120, Ex. 1 at 81.) Watters testified that, prior to Rivers's accident, he had received the CGL policy, which he did not review. (*Id*. at 43.)

Diana Coates was the Subsidiary Administrator for Doster at the time of the accident. (*Id*., Ex. 22 at 7.) In that position, she "handled several different jobs. She worked with the joint ventures some, with insurance, and with [Doster's] equipment." (*Id*. at 7-8.) On the Monday following the accident, Coates notified Zurich American Insurance Company, Joint Venture's insurance carrier, of Rivers's accident. (*Id*. at 18-20.) She did not notify Penn National because she considered that was SEI's responsibility. (*Id*. at 23-24.) She further testified that Doster had questioned Zurich investigating the accident because "we did not consider that [Zurich] needed to do an investigation if we weren't going to be involved in the case or that there was even going to be a case to be involved in at that time." (*Id*. at 21.)

Rivers served SEI with "a petition for presuit discovery" in early March 2005. (*Id*., Ex. 1 at 50-51.) According to billing records, Zurich retained an attorney to defend the Joint Venture as early as March 21, 2005. (Doc. 120, Ex. 25 at 0356.) Watters testified that he recalled sending the discovery petition to Prewitt. (*Id*., Ex. 1 at 51.) He testified he had called Prewitt in late March and told him about the pre-suit discovery. (*Id*. at 59-60.) Also, the record contains a letter to Prewitt from Watters purporting to memorialize Watters's verbal report. (*Id*., Ex. 8.) Watters testified that he did not remember if SEI sent the letter,

11

but he had assumed someone in his office had sent the letter to Prewitt. (*Id*., Ex. 1 at 60-61.) However, Prewitt testified that he had not received the letter, dated April 1, 2005, from Watters, and he also testified that he had not received a telephone call from Watters in March 2005 about the presuit discovery. (*Id*., Ex. 9 at 2.)

On August 25, 2005, Rivers filed a Complaint in the Circuit Court of Jefferson County, Alabama, alleging that he had been injured as a result of SEI and the Joint Venture's negligent and/or wanton conduct and as a result of their violations of Ala. Code § 25-1-1, "Duties of employers, etc., with respect to provision of safe employment;" § 25-5-11, "Actions against third parties jointly liable with employers for injuries or death; actions for injury or death resulting from willful conduct; attorney's fees in settlements with third parties;" and § 25-6-1, "Liability of master or employer; effect of servant's or employee's knowledge of defect or negligence causing injury." (*See* doc. 119, Ex. D.) In its Answer to Rivers's Complaint, SEI pled "immunity if the plaintiff is deemed to be its employee." (Doc. 114, Ex. L at 2.)

On October 4, 2005, the Joint Venture's attorney notified Prewitt of Rivers's accident and the state-court action on behalf of the Joint Venture. (Doc. 120, Ex. 23.) This letter stated:

> Our office represents Integral Building Group, LLC, Doster Construction Company, Inc., and Metropolitan Gardens Developers, LLC in regard to a claim which is being made by Larry Rivers . . . . ***Mr. Rivers was an employee, agent, or other type of laborer for [SEI] on 10/8/2004***. Mr. Rivers was working in this capacity when he was injured on the job site. I am now writing pursuant to the subcontract in place as well as the . . . certificates of insurance

12

to request the provision of a defense and indemnification in regard to these
claims.

As you will see, each of my clients is listed as an additional insured on
the certificates and, pursuant to the contract, this coverage is to be primary in
regards to the claims made by [Rivers].

(*Id.* [emphasis added].)  Subsequently, on December 2 and 27, 2005, and February 2 and 27,

2005, the Joint Venture's attorney wrote to Penn National Claims Adjuster Jeff Bryant asking

if Penn National was going to defend and to indemnify the Joint Venture.  (Doc. 119, Ex. N.)

On February 23, 2006, Bryant sent a reservation-of-rights letter to the Joint Venture

that stated Penn National was continuing to investigate its "request for defense and

indemnity."  (Doc. 120, Ex. 17 at 1.)   The only exclusions that Penn National referenced

specifically in its letter dealt with the questions of whether Rivers was an employee and

whether his claims were based on the Joint Venture's own negligence.  (*Id.* at 1-3.)  The

letter did not reference the Joint Venture's late notice as a ground for excluding coverage.

(*See id.*)  However, the letter stated that Penn National's "investigation [was] subject to a

reservation of rights under the [specified] policy provisions *in addition to other provisions*

*which may not [have been] discussed in [the] letter*."  (*Id.* at 1 [emphasis added].)  The letter

also stated:

Please be advised that Penn National Insurance reserves any and all of its
rights under any of the provisions, definitions, conditions or exclusions
contained in any insurance policy issued by Penn National Insurance to [SEI]
of which your client may be an Automatic Additional Insured.  Furthermore,
upon the discovery of any other facts or issues relating to coverage of this
matter, ***Penn National reserves its rights to modify or amend its coverage
position and assert any defenses based upon any other policy provisions,***

13

> ***definitions, conditions or exclusions, whether or not specifically mentioned herein***.
>
> ***Please be advised that this is not a denial of coverage***, but rather to inform you of a coverage issue(s).  Any actions taken by Penn National Insurance in the investigation of this matter, or in negotiating for a compromise settlement, or in making any settlement, or in defending this lawsuit, or in any other way acting or failing to act, shall not constitute an admission of liability or an admission of coverage.  Furthermore, ***any actions taken by Penn National in connection with this matter are not to be deemed a waiver of any of its rights to disclaim liability or coverage under the insurance policy at issue***.

(*Id*. at 4 [emphasis added].)

Bryant testified he did not offer to defend the Joint Venture because he "didn't see that there was information to support doing that, and they were protected by Zurich.  So, if it was determined at a later date that [Penn National] should defend [the Joint Venture], [he] would contact Zurich and work that out with Zurich, as [Penn National did] on a regular basis."  (*Id*. at 236-37.)  He concluded that Penn National had coverage issues including whether Rivers was SEI's employee, late notice, and lack of cooperation.  (*Id*., Ex. 18 at 51-52.)  He based his assessment of the Joint Venture's coverage claim on the letter from the Joint Venture's attorney stating that Rivers had been SEI's employee, information that SEI had been served with presuit discovery in March 2005, and the fact that the lawsuit had been filed in August 2005.  (*Id*. at 52-53.)  He said, "[I]t was obvious there was an accident the year before that we had never obtained notice of, and according to the court clerk, there was a service on March 8, 2005, which we had no notice of."  (*Id*. at 53-54.)

14

On October 6, 2005, Watters faxed Rivers's Complaint in the underlying action to Prewitt; Prewitt sent the Complaint to Penn National. (*Id*., Ex. 9 at 2.) Prewitt testified that this was his first notice of Rivers's accident, which had occurred on October 8, 2004. (*Id*. at 1-2.)

Penn National sent a reservation-of-rights letter to SEI, dated October 12, 2005, that did not mention the lack of timely notice as a reason for questioning coverage. (*See* doc. 120, Ex. 13.) However, this letter stated, in part:

> ***Please be advised that this is not a denial of coverage***, but rather to inform you of a coverage issue(s). Any action taken by Penn National Insurance in the investigation of this matter, [or] any way acting or failing to act, shall not constitute an admission of coverage. Furthermore, ***any actions taken by Penn National Insurance in connection with this matter shall not be deemed a waiver of its rights to disclaim coverage under the insurance policy issued by Penn National Insurance***.
>
> . . .
>
> Penn National will investigate this matter under a Reservation of Rights. ***Penn National may amend this reservation of rights to include any decision regarding any information, which may or may not be known at this time to withdraw coverage any time in the future***.

(*Id*. at 3 [emphasis added].)

Bryant took a recorded statement from Watters on October 26, 2005; this statement contained no questions about late notice. (Doc. 111, Ex. 6.) Following the recorded statement, Bryant told Watters that Penn National would provide SEI a defense under a reservation of rights "based on the employee coverage issues in my letters" and that Penn National was considering "legal action on the issues that [Rivers] was not an 'independent

15

contractor' and would be considered an employee." (*Id*., Ex. 7.)  The second reservation of

rights letter Bryant sent to SEI, which is dated November 3, 2005, did not specifically refer

to the late notice.  (*See* doc. 120, Ex. 15.)  However, like the first reservation-of-rights letter,

the second letter stated:

> Please be advised that Penn National Insurance reserves any and all of its
> rights under any of the provisions, definitions, conditions or exclusions
> contained in any insurance policy issued by Penn National Insurance to [SEI].
> Furthermore, upon discovery of any other facts or issues relating to coverage
> of this matter, Penn National reserves its rights to modify or amend its
> coverage position and assert any defenses based upon any of the policy
> provisions, definitions, conditions or exclusions, whether or not specifically
> mentioned herein.
>
> Please be advised that this is not a denial of coverage, but rather to inform you
> of a coverage issue(s).  Any actions taken by Penn National Insurance in the
> investigation of this matter, or in negotiating for a compromise settlement, or
> in making any settlement, or in defending this lawsuit, or in any other way
> acting or failing to act, shall not constitute an admission of liability or an
> admission of coverage.  Furthermore, any actions taken by Penn National
> Insurance in connection with this matter are not to be deemed a waiver of any
> of its rights to disclaim liability or coverage under the insurance policy issued
> by Penn National Insurance.

(*Id*. at 3.)  This letter also stated, "You should also be advised that . . . Penn National may

seek legal adjudication of the coverage issues at hand.  As such, you may wish to hire

counsel at your own expense to handle those claims."  (*Id*. at 4.)

Bryant testified that an insurance carrier is obligated to notify its insured "when there

is a coverage issue."  (*Id*., Ex. 18 at 212.)  He testified that he had sent general reservation-

of-rights letters and reservation-of-rights letters that contained the specific policy language

at issue.  (*Id*. at 213-14.)  He testified that he had not included language specifically reserving

the late notice issue in the letters to SEI or the Joint Venture but that he had included a "paragraph that reserve[d] all rights." (*Id*. at 214.) Plaintiff's expert, Bert Nettles testified, "If [Penn National] had known [about the late notice issue], obviously . . . it would be preferable to [include the issue in its reservation-of-rights letters], but that's not the requirement of the law." (Doc. 111, Ex. 14 at 78-79.). He said that the reservation of rights letters "properly preserved all of [Penn National's] coverage issues." (Doc. 120, Ex. 28 at 2-3.)

Although Watters acknowledged receipt of the reservation of rights letters, he "never paid attention to [them]." (*Id*., Ex. 1 at 79.)

Brent Moelker, a Claims Specialist for Penn National, assigned SEI's defense to Larry Bradford. (*Id*., Ex. 24 at 9-10.) Bradford had practiced law for 28 years and for most of that time he had practiced insurance defense. (*Id*. at 7.) Penn National did not authorize Bradford to defend the Joint Venture. (*Id*. at 34.) Bradford testified that Penn National paid all of his bills and never refused anything he recommended in defense of SEI. (*Id*. at 109-10.)

On April 4, 2006, Penn National filed this declaratory judgment action, asking that the court to "declare whether Penn National owes a duty to defend and/or indemnify [SEI and the Joint Venture] under the Commercial General Liability Policy issued to [SEI] and bearing Policy Number CL9 060 3924 . . . ." (Doc. 1 at 10.)

On June 27, 2006, the Joint Venture filed a cross claim in the state-court action against SEI for breach of contract and failure to provide insurance coverage.  (Doc. 119, Ex. P at ¶¶ 11-14.)

The underlying state case went to mediation in August 2006.  Moelker  testified:

> . . . I went [into mediation] with my mind thinking that there was only a million dollars in coverage.
>
> Q.  At some point did you determine that there was another five million dollar layer in coverage?
>
> A.  I did.
>
> Q.   And was that coverage applicable at the time of this loss?  That being the umbrella [policy?]
>
> A. . . .  I thought it was.  There was a glitch in our underwriting file that showed that it was there.  It turned out that it was not applicable.
>
> . . .
>
> Q.  Why was it not applicable?
>
> A.  Because the insured requested that it be cancelled.
>
> Q.  Does [Penn National] intend to assert that the five million dollar layer is not available to protect its insured?
>
> A.  No.

(Doc. 120, Ex. 20 at  185-86.)

This umbrella policy that was found in the underwriting file had a $5,000,000 limit per occurrence and SEI had a retained limit of $10,000 for "each occurrence or offense not covered by underlying insurance."  (*Id*., Ex. 12 at 2.)  The policy provided coverage "on

behalf of the  insured [for] the 'ultimate net loss' in excess of the 'applicable underlying limit' which the insured [was] legally obligated to pay as damages." (*Id*. at 6.)  Pursuant to the terms of the umbrella policy –

"Applicable underlying limit means:

a.  If the policies of "underlying insurance" apply to the "occurrence" . . ., the greater of:

(1)  The amount of insurance stated in the policies of "underlying insurance" in the Schedule of Underlying Insurance[5] or any other available insurance less the amount by which any aggregate limit so stated has been reduced solely due to payment of claims; or

(2)  The "retained limit" shown in the Declarations or

b.  If the policies of "underlying insurance" do not apply to the "occurrence" . . ., the amount stated in the Declarations as the "retained limit".

The limits of insurance in any policy of "underlying insurance" will apply even if:

a.  The "underlying insurer" claims the insured failed to comply with any condition of the policy . . . .

(*Id*. at 15 [footnote added].)

An endorsement to the umbrella policy stated that it did not apply –

3.  To any liability for "bodily injury" . . . assumed by the insured under any contract . . .

. . .

_____

[5]The Schedule of Underlying Insurance is not attached to the umbrella policy of record.  (*See* doc. 120, Ex. 12.)

unless such liability is covered by valid and collectible "underlying insurance" as listed in the Schedule of Underlying Insurance, for the full limit shown therein, and then only for such hazards for which coverage is afforded under said "underlying insurance."

(*Id*. at 3.)

The umbrella policy contained a provision requiring SEI to "promptly" notify Penn National of any occurrence or claim, similar to the provision of the CGL policy. (*Id*. at 12.)

On September 1, 2006, the state court entered an Order, which stated, "The Court finds from the evidence that the Plaintiff . . . was an independent contractor. There was no evidence by any  party otherwise." (Doc. 114, Ex. Q.) Counsel for Penn National was present for the September 1, 2006 hearing, at which the state court entered its Order. (Doc. 116, Ex. T ¶¶ 4-5.)

Thereafter, Penn National sent a third reservation-of-rights letter to SEI; this one concerned coverage under the umbrella policy. (Doc. 120, Ex. 16.) The letter contained specific language regarding the notice requirement in the umbrella policy. (*Id*.) In this letter, Penn National stated that it was not denying coverage under the umbrella policy. (*Id*.) On September 18, 2006, Penn National amended its Complaint to ask this court to declare the rights of the parties under the umbrella policy. (Doc. 19 at 13-14.)

In September 2006, the Joint Venture negotiated a settlement of $275,000 with Rivers. (Doc. 119, Ex. R.) Shortly thereafter, the state court found in favor of the Joint Venture on its cross-claim. It found "no evidence of any negligence or otherwise improper conduct [of the Joint Venture] contributed to cause the injuries to Larry Rivers." (Doc. 119, Ex. I at 2.)

20

The court awarded the Joint Venture $275,000 and its attorney fees, costs, and expenses, which it later determined to be $66,155.35.

After a trial, the jury found in favor of Rivers and against SEI. The jury awarded Rivers $1,100,000 in compensatory damages and $400,000 in punitive damages against SEI.

On October 10, 2006, SEI filed a Counterclaim against Penn National. (Doc. 23.) It alleged breach of contract; bad faith failure to pay, failure to defend, failure to settle, and failure to investigate its claim; and intentional/wanton/negligent failure to procure coverage and/or failure to advise that coverage was inadequate. (*Id*. ¶¶ 52, 54, 57, 61.)[6]

On October 27, 2006, the Joint Venture filed a Counterclaim against Penn National. (Doc. 31.) It alleged breach of contract and bad faith failure to defend and failure to pay. (*Id*. ¶¶ 52, 54.) It also claimed it was "entitled to payment in satisfaction of the judgment entered in the state court action from Penn National as the claims are made through an insured contract." (*Id*. ¶ 57.)

### III. DISCUSSION

## A. COVERAGE

### 1. Notice

#### a. CGL Policy

---

[6]The court notes that SEI filed a Second Amended Counterclaim on January 15, 2007, (doc. 62), without the permission of the court and not in the form required by the court, (*see* doc. 28 at 4.) Therefore, the court has not considered SEI's Second Amended Counterclaim.

Penn National argues that SEI and the Joint Venture did not notify it of Rivers's accident as soon as practicable, as required under the terms of the CGL policy, and, therefore, the CGL policy does not provide them coverage.

"[Alabama] cases have consistently held . . . that the failure of an insured to comply within a reasonable time with such conditions precedent in an insurance policy requiring the insured to give notice of an accident or occurrence releases the insurer from obligations imposed by the insurance contract." *Reeves v. State Farm Fire and Cas.*, 539 So. 2d 252, 254 (Ala. 1989)(citing *Watson v. Alabama Farm Bureau Mut. Cas. Ins.*, 465 So. 2d 394 (Ala. 1985); *Pharr v. Continental Casualty Co.*, 429 So. 2d 1018 (Ala. 1983)), *quoted in State Farm Fire & Cas. Co. v. Wiggins*, 972 F. Supp. 570, 573 (M.D. Ala. 1997).

> The Alabama Supreme Court has interpreted the terms "as soon as practicable" . . . "to mean that 'notice must be given within a reasonable time in view of the facts and circumstances of the case.'" *Haston v. Transam. Ins. Servs.*, 662 So. 2d 1138, 1141 (Ala. 1995)(quoting *Pharr v. Continental Cas. Co.*, 429 So. 2d 1018, 1019 (Ala.1983)). There are only two factors for a court to consider in determining the reasonableness of a delay in giving notice: the length of and reasons for the delay. *Id.* (citing *Southern Guar. Ins. Co. v. Thomas*, 334 So. 2d 879, 883 (Ala.1976)). . . . Where there is no reasonable excuse for a delay in giving notice, the issue of whether the delay was reasonable may be decided as a matter of law. *Haston*, 662 So. 2d at 1141 (citing *Thomas*, 334 So. 2d at 882-83).

*Wiggins*, 972 F. Supp. at 573. "[A] primary insurer need not prove that it has been prejudiced by untimely notice of a claim by a policyholder in order to deny the claim based on late notice." *Midwest Employers Casualty Co. v. East Alabama Health Care*, 695 So. 2d 1169, 1172 (Ala. 1997)(citations omitted).

The terms of the CGL policy require notice to be given "as soon as practicable of an 'occurrence.'" (Doc. 120, Ex. 11 at 22.)  An "occurrence" is defined as "an accident." (*Id.* at 26.)  SEI did not notify Penn National of Rivers's accident until, at the earliest, late March or early April – approximately six months after the accident or, at the latest, in October 2005 after it was served with Rivers's Complaint – a year after the accident.  The Joint Venture did not notify Penn National until after it was served with Rivers's Complaint in early October 2005, a year after the accident.

Clearly, SEI as the Named Insured was required to give notice of Rivers's accident as soon as practicable.  Alabama has held that notice given six months following an accident, without a "reasonable excuse" for the delay, was not "reasonably timely notice." *Southern Guaranty Ins. Co. v. Thomas*, 334 So. 2d 879, 883, 885 (Ala. 1976).

SEI has presented evidence that it delayed giving Penn National notice because it did not know Rivers was going to file a claim.  However, supposition as to whether Rivers would sue is not a "reasonable excuse" for delay in giving notice.  "It was not the insured's duty under the terms of the policy to determine the probability of [a lawsuit] being filed; it was his duty to give the insurer notice of any accident or occurrence and to forward to the insurer every demand within a reasonable time." *Thomas*, 334 So. 2d at 885.

The policy clearly stated that SEI was required to give Penn National notice of Rivers's accident.  Rivers was hospitalized for 29 days following the accident.  Watters was aware of the extent of Rivers injuries; he went to the hospital after the accident and he visited

23

Rivers at his home after he was discharged from the hospital.  Nothing in the record disputes the fact that SEI unreasonably failed to give Penn National timely notice of Rivers's accident.

The court finds that Penn National is relieved of any obligation to provide coverage for SEI under the CGL policy because SEI failed to notify it as soon as practicable of Rivers's accident as required by the terms of the policy.

The plain language of the CGL policy does not require the Joint Venture, as an additional insured and not the Named Insured, to notify Penn National "as soon as practicable" of Rivers's accident or his lawsuit.  (*See* doc. 120, Ex. 11 at 22.)  Indeed, the only duties an additional insured has in the event of an occurrence or a suit are (1) to send Penn National copies of legal papers, (2) to authorize it to obtain records, (3) to cooperate in the investigation, settlement and/or defense of the suit, and (4) to assist it in its efforts to enforce insured's rights against another person or organization that may be liable.  (*Id*. at 22-23.)  Because the policy does not require the Joint Venture to give notice of the occurrence or suit, the lack of such notice does not release Penn National from its obligation to provide coverage to the Joint Venture under the CGL policy.

Defendants contend that Penn National has waived its right to deny coverage on the basis of late notice.  They argue that, because Penn National set forth certain specific provisions of the CGL policy related to employee injuries in its reservation-of rights letters, it cannot now rely upon other provisions of the CGL policy to deny coverage.  Under Alabama law –

24

> When a liability insurer, by assuming the defense of an action, leads one to believe liability to do so is *not denied*, it would be unfair to subsequently permit that insurer to *deny* coverage, when, without reservation and with knowledge, it assumes exclusive control of the defense of an action.  The general rule is limited by the principle that the insurer may avoid the operation of the rule by giving notice that the assumption of the defense is *not a waiver* of its right to deny coverage.

*Home Ins. Co. v. Rice*, 585 So. 2d 859, 861 (Ala. 1991)(internal citations and quotations omitted).  "[W]hen an insurer specifically *denies* liability on one ground, it *waives* other grounds or defenses it might later seek to assert.  In particular, defenses which are capable of being waived under the above principle are those that arise out of an express condition in the insurance contract," such as notice.  *First Alabama Bank of Montgomery, N.A. v. First State Ins. Co., Inc.*, 899 F.2d 1045, 1063 (11th Cir. 1990)(internal citations omitted; emphasis added).

The evidence is undisputed that Penn National's reservation-of-rights letters specifically stated that it was not denying coverage, that it was reserving its right to deny coverage on any ground, and that it was not waiving its right to deny coverage by investigating Rivers's claims or by defending SEI.  These letters are sufficient to reserve Penn National right to deny coverage to SEI under the CGL policy based on SEI's untimely notice.  *See id.* at 1063-64.

Based on the foregoing, the court finds that SEI is not entitled to coverage because it unreasonably failed to provide timely notice of Rivers's accident as required by the policy

and that the Joint Venture is entitled to coverage under the CGL policy as an additional insured despite its untimely notice.

### b.  Umbrella Policy

According to the record and stipulations of Penn National, the umbrella policy of record applies to SEI's claims in this case, despite the fact it was not in force at the time of the accident.  The record shows the umbrella policy was not in force until it was found in the underwriting file in August 2006, shortly before trial and after Penn National had filed this Declaratory Judgment action and was actively involved in the state-court case.

The court finds, as a matter of law, Penn National did not – and could not have – received notice of SEI's claim against the umbrella policy at any time before the policy was found and instated to cover SEI.  SEI's duty to notify Penn National arose only after Penn National found and instated the umbrella policy for SEI's benefit.  Therefore, Penn National cannot deny coverage under the umbrella policy based on late notice.

### 2.  Employment Status

### a.  Collateral Estoppel

Penn National argues that Rivers's claims were not covered by the policies at issue because Rivers was SEI's employee at the time of the accident.  Defendants contend that Penn National cannot deny coverage based on Rivers's employment status because the state court resolved this issue and such decision is binding on this court.

The Alabama Supreme Court has held:

> [W]e note that our cases applying the doctrine of collateral estoppel, or issue preclusion, have required the following elements: (1) that an issue in a prior action was identical to the issue litigated in the present action; (2) that the issue was actually litigated in the prior action; (3) that resolution of the issue was necessary to the prior judgment; and (4) that the same parties are involved in the two actions.  Where these elements are present, the parties are barred from relitigating issues actually litigated in a prior suit.

*Smith v. Union Bank & Trust Co.*, 653 So. 2d 933, 934 (Ala. 1995)(internal citations and quotations omitted).  Penn National was not a party in the state court case, and it is in an adversarial position to the defendants in its Declaratory Judgment action now before this court.  Under the circumstances, Alabama law compels a finding that there is no privity between Penn National and its insureds.  *See Dairyland Ins. Co. v. Jackson*, 566 So. 2d 723, 726-27 (Ala. 1990).

Therefore, the state court order is not binding in this case, and this court is obligated to resolve the question of Rivers's employment status based on the record in this case.

### b.  Employee or Independent Contractor

In Alabama –

> The test for determining whether a person is an . . . employee of another, rather than an independent contractor with that other person, is whether that other person has reserved the right of control over the means and method by which the person's work will be performed, whether or not the right of control is actually exercised.  How the parties characterize the relationship is of no consequence; it is the facts of the relationship that control.

*Thrash v. Credit Acceptance Corp.*, 821 So. 2d 968, 972 (Ala. 2001)(citations omitted); *see also Dickinson v. City of Huntsville*, 822 So. 2d 411, 416 (Ala. 2001).

27

The court finds that the evidence is sufficient to establish as a matter of law that Rivers was an independent contractor.  He was paid by the hour, but he had negotiated his method of payment because he did not want to be paid by the job.  The iron pipe, the trackhoe, and the sling were provided by SEI, but Rivers provided most of the tools he used on site.  Most importantly, SEI did not tell Rivers how to do his job.  Both SEI and Rivers considered Rivers to be an independent contractor.

Based on the record, the court finds no disputed issue of material fact as to Rivers's status as an independent contractor.  Therefore, the court finds that Penn National cannot deny coverage under the CGL policy to the Joint Venture or under the umbrella policy to SEI based on Rivers's employment status.

### 3.  Insured Contract

The Joint Venture contends that the CGL policy at issue in this case provided it coverage for its claims of indemnity as an "insured contract."  The CGL policy stated that it covered liability assumed in an "insured contract," which the policy defined as a part of the Named Insured's contract under which it has assumed the liability of another person to pay for "bodily injury" to a third party.  (Doc. 120, Ex. 11 at 14, 25.)  The subcontract between the Joint Venture and SEI required SEI to assume the liability of the Joint Venture.  There is no evidence that the Joint Venture, in "part of any other contract . . . pertaining to its business," had "assume[d] the tort liability of [SEI or any other] party to pay for [Rivers's]

28

'bodily injury.'" (*Id*. at 25.)  Thus, the Joint Venture has no coverage under the "insured contract" provision of the CGL policy.

Based on the foregoing, the court finds that Penn National's Motion for Summary Judgment is due to be granted and SEI and Rivers's Motions are due to be denied as to SEI's coverage under the CGL policy.  SEI's counterclaim based on breach of the CGL policy is due to be dismissed.  Penn National's Motion for Summary Judgment is due to be denied and defendants' Motions are due to be granted as to (1) SEI's coverage under the umbrella policy, and (2) the Joint Venture's coverage under the CGL policy.  The court will enter a judgment in favor of the Joint Venture and against Penn National as to Penn National's declaratory judgment action and on the Joint Venture breach-of-contract counterclaim based on the CGL policy, with leave to prove damages as to the breach-of-contract claim.  The court will enter a judgment in favor of the SEI and against Penn National as to Penn National's declaratory judgment action and on SEI's breach-of-contract counterclaim based on the umbrella policy, with leave to prove damages on the breach-of-contract claim.

## B.  BAD FAITH CLAIMS

SEI and the Joint Venture have filed Counterclaims alleging that Penn National acted in bad faith when it failed to investigate, to settle, and to pay Rivers's claims against them.[7]

---

[7]SEI also contends that Penn National did not "adequately" defend it.  The record contains no evidence that Bradford's defense of SEI was in any way inadequate.

The Joint Venture also alleges that Penn National acted in bad faith by failing to defend it in the state court action.

In order to recover on a bad faith claim, the insured must show (1) that it was entitled to benefits under the policy, and (2) that the insurer acted "intentionally or recklessly" with regard to a payment, investigation, defense, or settlement of a claim under the policy. *State Farm Fire & Casualty v. Slade*, 747 So. 2d 293, 318 (Ala. 1999); *Employees' Benefit Association v. Grissett*, 732 So. 2d 968, 976 (Ala. 1998). "Bad faith is not simply bad judgment or negligence.  It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will." *White v. State Farm Fire & Cas. Co.*, 953 So. 2d 340, 349 (Ala. 2006)(quoting *Slade*, 747 So. 2d at 303-04 (quoting *Gulf Atlantic Life Ins. Co. v. Barnes,* 405 So. 2d 916, 924 (Ala.1981)))(internal quotations omitted).

As set above, the court finds that Penn National was not required to provide coverage to SEI under the CGL policy due to SEI's failure to provide timely notice of Rivers's accident.  Therefore, all SEI's claims against Penn National for bad faith based on the CGL policy are due to be dismissed.

Moreover, SEI cannot prove any bad faith with regard to Penn National's actions pursuant to the umbrella policy.  The umbrella policy did not exist at the time of the accident.  The evidence shows that Penn National had agreed to make the umbrella policy, which SEI had previously cancelled, available to SEI anyway.  The court finds, as a matter of law, that

Penn National did not – and could not have – recklessly or intentionally failed to pay a claim, investigate a claim, or fail to settle a claim under a policy that did not exist, and now only exists for the benefit of SEI.  Therefore, all of SEI's bad faith claims based on the umbrella policy are due to be dismissed.

The court finds that Penn National has not established that it is entitled to Summary Judgment as to the Joint Venture's bad faith Counterclaims.  As set forth above, the Joint Venture was entitled to coverage under the CGL policy.  However, a question of fact exists as to whether Penn National acted recklessly or intentionally with a dishonest purpose as to defending the Joint Venture, investigating or settling Rivers's claims, and in failing to pay the settlement amount.

Based on the foregoing, the court finds that Penn National's Motion for Summary Judgment as to the bad-faith Counterclaims is due to be granted as to SEI's Counterclaims and denied as to the Joint Venture's Counterclaims.  The court will enter an Order dismissing SEI's bad-faith Counterclaims.

## C.  FAILURE TO PROCURE INSURANCE AND/OR FAILURE TO ADVISE OF LACK OF COVERAGE

In its Counterclaim, SEI alleges that Penn National negligently, intentionally, or wantonly failed to procure insurance for it and/or failed to advise it that it lacked coverage. In order to establish a cause of action based on failure to procure insurance or failure to advise about a lack of coverage, SEI must show that Penn National had **agreed** to procure the insurance that SEI requested and that it undertook the duty to advise SEI on the extent

31

of its coverage. *See Pate v. Rollison Logging Equipment, Inc.*, 628 So. 2d 337, 343 (Ala. 1993)("Once a prospective insured and a broker agree regarding the procurement of insurance, the broker has a duty to use reasonable care to effect coverage and may be liable for negligently failing to do so . . . ."); *see also Hawk v. Roger Watts Ins. Agency*, No. 2060929, 2008 WL 400361, at *6 (Ala. Civ. App. Feb. 15, 2008).

The record is completely devoid of any evidence that SEI ever directly contacted Penn National regarding the procurement of insurance. Without some agreement to find and procure insurance, Penn National is not liable to SEI based on SEI's contention that Penn National failed to procure insurance on its behalf and/or failed to inform it of gaps in requested coverage.

Therefore, the court finds that Penn National's Motion for Summary Judgment is due to be granted as to SEI's claim of failure to procure insurance and/or failure to advise of a gap in coverage. The court will enter an Order dismissing such claim.

## CONCLUSION

As set forth above, the court finds:

1. There are no material facts in dispute and Penn National is entitled to judgment in its favor on its Declaratory Judgment that SEI is not entitled to coverage under the CGL policy and SEI's counterclaims for breach of the CGL policy, bad faith, and failure to procure /failure to advise. Penn National's Motion for Summary Judgment will be granted as to these claims and defendants' Motion for Summary Judgment will be denied.

32

2.  There are no material facts in dispute and SEI is entitled to judgment in its favor based on the coverage question under the umbrella policy.  Penn National's Motion for Summary Judgment will be denied as to this claim, and defendants' Motion for Summary Judgment will be granted.

3.  There are no material facts in dispute and the Joint Venture is entitled to judgment as a matter of law as to coverage under the CGL as an additional insured; therefore, its Motion for Summary Judgment will be granted as to this claim and Penn National's Motion for Summary Judgment will be denied.

4.  There are no material facts in dispute and Penn National is entitled to judgment as a matter of law as to the Joint Venture's coverage under the CGL and the umbrella policy pursuant to an "insured contract;" therefore, Penn National's Motion for Summary Judgment will be granted as to this claim and the Joint Venture's Motion for Summary Judgment will be denied.

5.  The court finds there are material facts in dispute as to the Joint Venture's claims of bad faith.  Therefore, Penn National's Motion for Summary Judgment will be denied.

6.  In accordance with the foregoing, Rivers's Motion for Summary Judgment as to the coverage  issues will be denied in part and granted in part.

An Order granting in part and denying in part the parties' Motions for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 31st day of March, 2008.

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE